IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 2:18-CR-116-MHT-WC |
| | ) | |
| G. FORD GILBERT, | ) | |
| MARTIN J. CONNORS, and | ) | |
| RANDALL M. DAVIS | ) | |

**GOVERNMENT'S TRIAL BRIEF**

Comes now the United States of America, by and through Louis V. Franklin, Sr., United States Attorney for the Middle District of Alabama, and submits this trial brief.  The following sets forth: (1) the facts to be established at trial; (2) the case's procedural history; (3) the elements of the charged offenses; (4) the means by which the government intends to prove the charged offense; and (5) evidentiary issues likely to arise.

## I. BACKGROUND

The government's trial evidence will establish that, during 2015 and 2016, Defendant G. Ford Gilbert orchestrated a scheme to use bribery of a state legislator to advance through the Alabama Legislature a bill advantageous to a business Gilbert owned.  The details of this scheme, which the government will establish at trial, are as follows.

### A.    Trina Health, LLC

Trina Health, LLC (Trina Health) was a Sacramento, California-based health care services corporation formed in approximately 2012.  Defendant Gilbert was the founder and president of Trina Health.  During the relevant period, Trina Health operated, through license agreements, diabetes treatment clinics.  At these clinics, patients received outpatient intravenous insulin infusion therapy (OIVIT).  According to Trina Health's promotional materials, the

treatment was administered by providing through intravenous injection pulses of insulin necessary to stimulate carbohydrate metabolism.

As noted, Trina Health's business model was based on license agreements. Individuals purchased territorial rights from Trina Health and then operated individual clinics under license agreements with Trina Health.

**B.     Trina Health's Expansion into Southern Alabama**

In February of 2014, CP Homes LP (CP Homes), a Dallas, Texas-based owner of nursing homes and retirement facilities in Texas and Alabama, purchased the rights to open Trina Health clinics in the southern portion of Alabama. To do so, CP Homes formed a subsidiary corporation, Trina Health of Alabama. The subsidiary then opened two clinics—one in Fairhope, Alabama and one in Foley, Alabama. The business hired local doctors to work at the clinic and oversee the operation of the intravenous insulin injection machines.

Initially, the Foley and Fairhope clinics submitted claims to the state's largest private health insurer, Blue Cross-Blue Shield of Alabama (BCBS-AL) and BCBS-AL paid those claims. Importantly, BCBS-AL did this somewhat unwittingly. Trina Health instructed the physicians employed by the clinics to refrain from submitting claims using the Healthcare Common Procedure Coding System (HCPCS) code assigned by the Center for Medicare and Medicaid Services (CMS) for outpatient intravenous insulin injection therapy.

In 2010, CMS assigned an HCPCS code to OIVIT, the therapy offered at Trina health clinics. CMS also issued a decision stating that CMS programs would not cover OIVIT. Because BCBS-AL generally follows CMS coverage decisions, had the Trina-Health doctors used that code, then BCBS-AL would have denied the claims submitted by the physicians at the Foley and Fairhope clinics. However, Trina Health physicians did not submit claims using the

HCPCS code applicable to OIVIT.  Rather, they placed on submitted claims the HCPCS codes applicable for the various component parts of the treatment.  By billing for the component parts, rather than the whole, Trina Health kept BCBS-AL from realizing that it was paying for a non-covered treatment.  In most cases, BCBS-AL paid around $650 per three-hour treatment session.

**C.**      **Trina Health's Expansion into Northern Alabama**

In 2015, that another investor group became interested in opening a clinic in Alabama. This group focused its attention on the northern portion of the state.  The northern Alabama investor group's leader was Charles Burbage.  In 2015, Burbage purchased from Trina Health the territorial rights to the Birmingham area.  He then registered a corporation in Wyoming, Trina Health Care Partners, LLC (THCP), through which he planned to operate the northern Alabama clinics.  Subsequently, Burbage created a subsidiary business to own the Birmingham clinic, THCP BHAM AL 1, LLC.  (THCP Bham).  That business was also registered in Wyoming. After forming his business, Burbage began to recruit other folks to help him in the enterprise. Among the people he identified was Micky Hammon, a Decatur businessman and a member of the Alabama House of Representatives.  In fact, at that time, Hammon served as the chamber's majority leader.  Sometime in 2014, Burbage described the business model to Hammon. Hammon was immediately interested.  Burbage then took Hammon to the Fairhope and Foley clinics to demonstrate to Hammon the sort of work that the clinics did.  During that trip, Burbage introduced Hammon to Gilbert, who happened to be in town.

Before forming his businesses, Burbage began to recruit other individuals to help him in the enterprise.  Among the people he identified was Micky Hammon, a Decatur, Alabama businessman and the majority leader of the Alabama House of Representatives.  Sometime in 2014, Burbage described the business model to Hammon.  Hammon was immediately interested.

Burbage then took Hammon to the Fairhope and Foley clinics to demonstrate to Hammon the sort of work that the clinics did.  During that trip, Burbage introduced Hammon to Gilbert, who happened to be in town.

After touring the clinics, Hammon agreed to become a member of the ownership group for the THCP venture.  There was only one problem.  As Burbage knew, Hammon lacked the funds to invest.  He lacked any capital to use to obtain an ownership interest.  Desiring to have Hammon in the business, Burbage offered Hammon the opportunity to receive an ownership interest in THCP as a "finder's fee" if Hammon was able to recruit other investors.

Soon thereafter, Hammon shared this business opportunity with Defendant Randall M. Davis.  Davis was also a member of the Alabama House of Representatives, representing portions of Baldwin and Mobile Counties.  Davis agreed to help Hammon recruit investors.

During the latter half of 2014 and into early 2015, Hammon and Davis actively sought investors for THCP.  They did so by attending meetings with and emailing Trina Health promotional materials to potential investors.  In May of 2015, Hammon found a group of investors willing to pay to Burbage almost $400,000 in exchange for an ownership interest in THCP.  For finding these investors, Burbage gave Hammon a 5 percent stake in the business.  At Hammon's request, Burbage subsequently reduced the ownership interest to four percent.  Hammon requested this reduction in equity so that he could legally avoid disclosing his ownership interest on Statement of Economic Interests Forms that Alabama law required Hammon to file each year.

**D.**     **Problems with BCBS-AL and the Opening of the Hoover, Alabama Trina Health-Affiliated Clinic**

Meanwhile, in May of 2015, BCBS-AL realized that the health care providers at the Foley and Fairhope Trina Health-affiliated clinics had been submitting claims for non-covered

4

services.  Accordingly, that month, BCBS-AL's Network Integrity office officials sent letters to the health care providers at those clinics requesting repayment of funds paid for OIVIT services. The health care providers shared the letters with the officials of their corporate owner, CP Homes.  The CP Homes officials promptly forwarded the BCBS-AL letters on to Defendant Gilbert.  In response, Gilbert assured the health care providers and the CP Homes officials that he would be able to persuade BCBS-AL to change its position regarding coverage of the treatment.

On August 1, 2015, Gilbert attended a meeting at the BCBS-AL headquarters in Birmingham, Alabama with the Foley and Fairhope health care providers and the BCBS-AL Network Integrity officials.  As the BCBS-AL officials understood it, Gilbert was appearing as the legal representative of the health care providers.  Not long after the meeting got underway, though, Gilbert identified himself as the owner of Trina Health and the founder of the Artificial Pancreas Treatment.  Gilbert urged BCBS-AL to change its position regarding coverage of the treatment.  The Network Integrity officials informed Gilbert that it was not their place to make prospective decisions regarding coverage; theirs was only to seek to recover money erroneously paid.  Gilbert then requested a meeting with the employees of BCBS-AL's Medical Policy office—the people who would be able to change the company's coverage decision regarding the Trina Health treatments.

Soon after the August 1 meeting, Gilbert informed Hammon and Burbage of the problems the Baldwin County clinics had encountered with BCBS-AL.  At that point, the Hoover clinic was just weeks away from opening.  Gilbert suggested that the Hoover clinic was likely to encounter the same issues when its providers submitted claims to BCBS-AL.  Nevertheless,

Gilbert encouraged Hammon and Burbage to proceed with opening the clinic.  Gilbert was confident that BCBS-AL would soon be changing its decision.

Accepting of Gilbert's assurances, Hammon and Burbage elected to proceed with opening the Hoover clinic.  On September 15, 2015, Gilbert, Hammon, and Burbage attended the grand opening ceremony for the Hoover clinic.  So too did then-Alabama Governor Robert Bentley.  Bentley attended at Hammon's request.  Soon after the grand opening ceremony, a CP Homes executive wrote to another executive regarding a conversation she had with Hammon during the event.  She wrote that Hammon promised to "bring in his friends . . . for more leverage force" in the dispute with BCBS-AL.

During the fall of 2015, Gilbert formed a group he named the "BlueGate Coalition."  He described the group as "an unincorporated association helping victims and fighting insurance abuses."  The group's slogan added that "membership is free and confidential."  In a BlueGate Coalition promotional letter, Gilbert described a plan of action to challenge BCBS-AL's denial of coverage for Trina Health's treatment.  That plan consisted of, inter alia: (1) launching a public opinion campaign; (2) filing state court lawsuits in Baldwin County, Alabama; (3) filing federal ERISA and RICO lawsuits; (4) enlisting the help of the Alabama Education Association; and (5) advocating for the enactment of state laws requiring BCBS-AL to cover the therapy.

On November 30, 2015, Gilbert and others (not including Hammon) attended a meeting at the BCBS-AL office.  Unlike the August 1 meeting with the Network Integrity officials, this meeting was with the employees of BCBS-AL's Medical Policy office.  The purpose of the meeting was for Gilbert to make a presentation designed to persuade BCBS-AL to reconsider its position During that meeting, Gilbert advocated for BCBS-AL to cover the therapy.  BCSBS-AL's physicians and attorneys informed Gilbert that BCBS-AL would not be covering the

therapy, consistent with the CMS guidance.  Gilbert argued that the CMS memorandum did not cover the artificial pancreas treatment.  BCBS-AL doctors disagreed.  During a subsequent meeting in December of 2016, Gilbert became hostile.  At some point during the meeting, he stated, "We will see what the legislature has to say about this."

Thereafter, during January and February of 2016, Gilbert sent a barrage of emails to various BCBS-AL officials.  In those emails, Gilbert accused BCBS-AL of extortion, intentionally causing sickness in Alabama, and various other nefarious things.  Gilbert blind carbon copied Hammon on each of his emails to BCBS-AL.  Gilbert was unable to persuade BCBS-AL to reconsider its position.

In early 2016, as Gilbert began to focus on a legislative solution to his problem, he turned to Hammon for assistance.  Gilbert asked Hammon to introduce a bill and to push for its passage. Hammon informed them that his doing so would violate state law.  Around this time, Gilbert began to refer to Hammon using the alias "Bill Johnson."

**E.     The Drafting of H.B. 415**

Notwithstanding Hammon's refusal to overtly help Gilbert, Hammon remained intimately involved in Gilbert's plan to push for legislation.

Gilbert hired a lobbyist to assist in the legislative effort, Defendant Marty Connors. Officially, it was CP Homes—the owner of the Foley and Fairhope clinics—employing Connors. However, CP Homes authorized Connors to take direction from Gilbert.

In February of 2016, Connors sent an email to Gilbert stating that Defendant Davis had told him about a bill that had just been introduced in the House of Representatives that would require health insurance companies to cover a certain form of cancer treatment.  Connors suggested that this bill could serve as a model for a Trina Health-backed bill.  Gilbert agreed and

asked Connors to send him a copy of the bill.  Connors complied.  Gilbert then drafted a bill that effectively would require all health insurance companies in Alabama to OIVIT.  Gilbert showed the bill to Hammon and Hammon instructed Gilbert to get it to Connors.  Gilbert did so.

Thereafter, Connors tried to find a sponsor for the bill.  He first approached Rep. Ron Johnson—the sponsor of the cancer treatment related bill.  Rep. Johnson was frustrated that BCBS-AL was blocking his bill and was eager to ramp up his fight with BCBS-AL.  Thus, he agreed to sponsor the Trina Health-backed bill.

Connors also spoke with Defendant Davis.  Davis, motivated in part by his friendship with Hammon and his desire to assist Hammon's business venture, agreed to support the bill.

Around the same time that Gilbert drafted his bill, he also began a lobbying campaign of his own.  Hammon introduced Gilbert to Rep. Jack Williams of Hoover, Alabama.  Williams was a longtime member of the House of Representatives and the chairman of the Commerce and Small Business Committee.  In February of 2016, Gilbert traveled to Alabama and had dinner with Williams.  As it turned out, Williams and Gilbert had a mutual friend.  In light of this connection and Hammon's interest in the bill, Williams was receptive to Gilbert's entreaties to assist him in the fight with BCBS-AL.  Williams told Gilbert that he (Williams) would see to it that, once introduced, any legislation was assigned to his committee.

After that dinner, Williams called Hammon and told him about the dinner and Williams's enthusiasm for Trina Health's work.  Hammon and Williams also discussed Hammon's financial interest in Trina Health.

## F.    Gilbert's Intervention in Hammon's Debt Collection Case

Throughout the entire period he was associated with Trina Health, Hammon was experiencing dire financial problems.  One of those problems was an outstanding debt that Hammon owed to Regions Financial Corporation (Regions) of approximately $240,000.  The note was past due, and, in 2015, Regions obtained a consent judgment against Hammon in the amount due on the note.

Under that consent judgment, Hammon had 12 months to pay the full amount due.  That 12-month period was set to expire in February of 2016.  Accordingly, an attorney for Regions, Kevin Gray (then of Maynard, Cooper & Gale, P.C. in Birmingham), had been coordinating with Hammon's attorney regarding the possibility of extending the repayment period.  During those conversations, Hammon's attorney suggested that Hammon was working on a business deal with Gilbert and that Hammon anticipated coming into a large sum of money very soon.

Soon thereafter, in late January or early February of 2016—at the same time that Gilbert was scheming to get his bill through the legislature—Gilbert telephoned Gray.  During that conversation, which occurred after Hammon supposedly renounced his affiliation with Trina Health, Gilbert told Gray that Hammon was actively recruiting investors for Trina Health and that Hammon would receive substantial finder's fees for each investor recruited.  Gilbert also acknowledged the ongoing dispute with BCBS-AL, but stated that the dispute would soon be resolved in Trina Health's favor.  Gilbert did not mention the bill, though.  Gilbert simply asked that Regions extend the repayment period on the consent judgment.

A few days later, on February 13, 2016, Gilbert sent Gray an email and blind carbon copied Hammon.  In that letter, Gilbert wrote, "Micky Hammon has been working on the massive diabetes problem of Alabama for over a year.  Through his funding and associates, he was able to get our company to open 3 clinics in Alabama, (Hoover, Fairhope and Foley)."  As

Gilbert would later admit during grand jury testimony, this statement was a lie.  Hammon had played no role in the opening of the Foley and Fairhope clinics and Hammon had not put any money forward to open the Hoover clinic.  Later in the email, Gilbert bragged about the governor's attendance at the opening of the Hoover clinic and then stated that BCBS-AL was to blame for Hammon not having already repaid Regions.  Gilbert assured Gray that Trina Health would become profitable soon and when it did, Hammon would be able to "use funds to pay off the debt to [Regions]."  Gilbert added that the phone call and letter were "not a pie in the sky or delaying tactic."  Gilbert claimed that he "ha[d] a certain amount of credibility, being the law firm partner of Supreme Court Justice Anthony M. Kennedy and having represented Ronald Ragan [sic] personally."  Gilbert closed the letter as follows: "Please allow me to facilitate payment that is helpful to all."

After Gilbert sent the February 13 email, Hammon sent an email to Gilbert.  The email stated: "Great letter.  Thank you Ford."

On March 1, 2016, Gilbert sent Gray another email.  In this message, Gilbert stated that he was "ready to write the instructions from the Bank to Trina Health for Trina to pay the Bank first, with an ongoing payment plan at the same time."  This appeared to suggest that Gilbert was willing to directly pay Hammon's debt and then permit Hammon to make payments to Trina Health.

At this time, Hammon understood that Gilbert's intervention with Regions was directly related to Hammon's willingness to assist Gilbert with the legislation.  Specifically, Hammon thought that Gilbert was doing this in order to get Hammon to push the bill through the House of Representatives because, in Hammon's words, Hammon "ran the show in the State House."

**G.**     **Introduction of H.B. 415**

A little while later, Gilbert provided his draft bill to Connors who then presented it to the Alabama Legislative Reference Service in order for it to be put into the appropriate style. Connors did so under granted authority from Williams. As they prepared to introduce the bill, Hammon was consulted at every turn.

For example, on March 1, 2016, Connors sent an email to Gilbert and others (and blind carbon copied Hammon) stating that he "had a strategic chat with Majority Leader tonight before [he] got to the Senator Shelby event." The email went on to state that Hammon, the House majority leader, advised that the bill should go to the "Commerce [Committee] (Williams)." Connors suggested a conference call and then closed by writing, "I'll talk to Leader." The next day, Gilbert scheduled a conference call. He included Hammon on the email doing so. When interviewed, Hammon remembered Connors approaching him at the event. Hammon said that Connors requested that Hammon present the bill to the Legislative Reference Service for introduction. Hammon insisted that he could not do so. Hammon suggested that Williams would be the best person to do that.

Thereafter, on March 15, 2016, Johnson introduced the bill into the House of Representatives. The bill was captioned, H.B. 415. At Williams's request, Speaker Mike Hubbard assigned the bill to Williams's committee, the Commerce and Small Business Committee. Several members of the committee thought that this was odd and that the bill would more appropriately go to the Health or Insurance Committees. When one member asked Williams why the bill was in the Commerce and Small Business Committee, Williams, according to Garrett, said that he was "trying to help out Micky [Hammon]."

Shortly after the bill's introduction, in April of 2016, Gilbert came to Montgomery and attended, at Hammon's invitation, a lunch meeting of the House Republican Caucus.  The meeting occurred in the Alabama State House.  Defendant Davis introduced Gilbert.

## H.    Hearing on H.B. 415

Once the bill was assigned to Williams's committee, Williams scheduled a hearing.  The date of the hearing was to be April 13, 2016.  On April 2, Gilbert sent an email to various Trina Health investors and affiliates.  The subject line stated "Our Bill."  Gilbert blind carbon copied Hammon on the message.  In the email, Gilbert informed the recipients of the date of the hearing and asked that the recipients help to generate "such a newsworthy event" that BCBS-AL would "recant" or the bill would pass out of committee.

On April 11, 2016, Gilbert arrived in Montgomery.  When he did, he sent an email to Burbage, Connors, Williams, and Davis reporting his arrival.  He blind carbon copied Hammon on the email.

The day of the hearing, Hammon, Williams, Connors, Gilbert, and Davis had a meeting. During that meeting, they discussed how the hearing might go and that the hearing could be a tool for forcing BCBS-AL to negotiate with Trina Health.  Williams later reported that, although he had independent motivations for attending the meeting and holding the hearing, he also knew that a resolution to the issue would be of some benefit to Hammon.

At the hearing, Gilbert spoke in favor of the bill.  So too did Davis.  During his remarks, Davis falsely claimed that the Foley and Fairhope clinics were located in his district.  As he knew, neither one actually was.  A BCBS-AL physician testified in opposition.  Hammon did not personally attend the hearing.  However, he lurked outside the hallway and periodically listened through the door.

12

Williams scheduled the bill for a vote during an April 19, 2016 committee meeting. However, before that date, Williams pulled the bill from the committee's calendar.  The bill ultimately died in the committee.

## I.      April 2016 Payments to Hammon

While the bill was pending in the state legislature, on April 7, 2016, Trina Health wired to Hammon's personal bank account $2,000.

## J.      Subsequent Efforts by Gilbert

After the bill failed, Gilbert was not entirely deterred.  Gilbert began to discuss making another attempt at passing a bill—this time during the 2017 legislative session.  To that end, Gilbert asked Hammon for his assistance.  Hammon was not eager to help.  In an attempt to change Hammon's mind, Gilbert again brought up the issue of helping Hammon pay his debt.

Specifically, in May of 2016, Hammon sent to Gilbert a message regarding his outstanding debt.  Gilbert replied that he would be willing to pay "all fees due" to Hammon directly to "Regents [sic] Bank."  Gilbert did not specify just what "fees" were due or why Trina Health owed Hammon "fees."

Cut off from funding by health insurance companies, Trina Health's Alabama clinics closed in 2017.

## II. PROCEDURAL HISTORY

## A.      Initial Indictment and Not Guilty Pleas

On March 4, 2018, the grand jury returned a 14-count indictment against Gilbert, Connors, and Williams.  Doc. 1.  The indictment charged the defendants with, inter alia, conspiring to commit bribery, in violation of 18 U.S.C. § 371.  Id. at 1–17.  The bribery scheme alleged was based on the above-described events.  See id.  The indictment did not charge

Hammon, as Hammon had previously pleaded guilty in a related case.  See United States v. Micky Ray Hammon, 2:17-CR-427-MHT-CSC (M.D. Ala.).

On April 18, 2018, the defendants appeared before a magistrate judge and pleaded not guilty to the charges.  Doc. 25.

**B.     Superseding Indictment and Not Guilty Pleas**

On July 24, 2018, the grand jury returned a superseding indictment.  Doc. 69.  Count one of the superseding indictment generally alleges a similar conspiracy offense as the one set forth in the original indictment.  See id. at 1–50.  The new indictment does, however, contain more factual allegations than did the original one.  Additionally, the superseding indictment adds Defendant Davis and removes Defendant Williams.

Counts 2 through 5 each charge Gilbert with substantive acts of bribery concerning a federal program, in violation of 18 U.S.C. § 666(a)(2).  Id. at 50–52.  Each count is based on a separate thing of value Gilbert gave to Hammon in exchange for Hammon's exerting influence in the Alabama Legislature on Gilbert's behalf.  See id.

Counts 6 and 7 allege that Gilbert violated the Travel Act, see 18 U.S.C. § 1952(a)(3), by engaging in interstate travel and sending email communications in furtherance of state law bribery offenses.  Doc. 69 at 52–53.  Count 8 is similar.  It charges Davis with violating the Travel Act by sending email messages in furtherance of a state law bribery scheme.  Id. at 54. Last, Count 9 alleges that Connors made a false statement to a federal agent about a matter material to the federal government, in violation of 18 U.S.C. § 1001.  Id. at 54–55.

On August 8, 2018, Defendants Gilbert, Connors, and Davis appeared before a magistrate judge.  Each pleaded not guilty to the counts alleged in the superseding indictment.  Doc. 101; Doc. 102; Doc. 103.

## III. ELEMENTS OF THE OFFENSES

The following describes the elements the government will need to establish as to each count.

### A.        Conspiracy – Count 1

To convict the defendants on count 1, the government will be required to prove: (1) two or more persons, in some way, agreed to accomplish a shared and unlawful plan; (2) the defendant knew the unlawful purpose of the plan and willfully joined in it; (3) during the conspiracy, one of the conspirators knowingly engaged in at least one overt act as described in the indictment; and (4) the overt act was committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy.  See 11th Cir. Pattern Crim. Jury Inst. O13.1 (2018).

### B.        Bribery Concerning Federal Programs – Counts 2 through 5

To convict Gilbert on Counts 2 through 5 the government will need to show: (1) the defendant gave something of value to a person; (2) the defendant did so with the intent to corruptly influence or reward an organization of a state, local, or tribal government; (3) the defendant gave the thing of value in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more; and (4) the organization, government, or agency at issue received, in any one year period, benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of federal assistance.  See United States v. McNair, 605 F.3d 1152, 1186 (11th Cir. 2010).

### C.        Travel Act – Counts 6 through 8

As for Counts 6 through 8, to convict Gilbert and Davis, the government will be required to prove: (1) the defendant traveled in interstate or foreign commerce, or sent electronic communications in interstate or foreign commerce; (2) the defendant traveled with or sent the communications with, the specific intent to promote, manage, establish, or carry on an unlawful activity; and (3) while traveling, the defendant knowingly committed an act to promote, manage, establish, or carry on an unlawful activity.  See 11th Cir. Pattern Crim. Jury Inst. O71 (2018).

**D.      Making a False Statement – Count 9**

To convict Connors on Count 9, the government will have to show: (1) the defendant made a statement; (2) the statement was false; (3) the falsity concerned a material matter; (4) the defendant acted willfully, knowing that the statement was false; (5) the false statement was made or used for a matter within the jurisdiction of a department or agency of the United States.  See 11th Cir. Pattern Crim. Jury Inst. O36 (2018).

**IV. TRIAL EVIDENCE**

The following, in general terms, explains the manner in which the government will prove the various counts alleged in the superseding indictment.

**A.      Conspiracy Count**

To prove the primary conspiracy count, the government will rely primarily on the following types of evidence: (1) the testimony of cooperating co-conspirator-witnesses, namely, Hammon and Williams; (2) the testimony of BCBS-AL employees who dealt with Gilbert during the dispute between Trina Health and BCBS-AL over coverage of OIVIT; (3) the testimony of the attorney for Regions with whom Gilbert dealt regarding Hammon's debt, Gray; (4) the testimony of legislators contacted by Hammon and encouraged to support H.B. 415; (5) the testimony of a C.P. Homes official who interacted with Gilbert as Gilbert pushed H.B. 415

through the legislature; (5) financial records documenting payments by Trina Health individuals to Gilbert; and (6) copies of email messages obtained from Hammon, Trina Health, BCBS-AL, Davis, and CP Homes.  As for the email messages from CP Homes and Trina Health, those messages will be introduced through records custodians from those companies.

Direct evidence of the agreement will come primarily through Hammon.  Circumstantial evidence will come through the records of Hammon's and Gilbert's communications.  Evidence of the overt acts alleged in the superseding indictment will arise from the various other witnesses who interacted with Gilbert during the period alleged in the superseding indictment.

**B.      Substantive Bribery Counts**

The evidence for the substantive counts of bribery alleged against Gilbert will consist of the following things.  First, testimony from Hammon, Gray, and financial records documenting that Gilbert gave the specific things of value to Hammon.  As for Counts 3 and 5, the evidence will come from Gray and email messages that Gilbert intervened on Hammon's behalf with Regions.  Hammon will testify that the intervention was valuable to him, as it afforded him time he otherwise would not have had in order to repay his debt.  Second, the evidence regarding the conspiracy described regarding count one will be circumstantial evidence that Gilbert acted with corrupt intent.  Third, BCBS-AL officials will testify that the issue of whether or not BCBS-AL was going to cover OIVIT was an issue that would have cost state insurance programs significantly more than $5,000.  Fourth, a state records custodian will testify that, during 2015 and 2016 each, Alabama received more than $10,000 in subsidies from the federal government.

**C.      Travel Act Counts**

Turning to the Travel Act violations, as for Count 6, the government will show that Gilbert traveled from Mexico to Montgomery through the use of government border crossing

records and Gilbert's own email message.  As for Counts 7 and 8, the government will introduce electronic mail messages send by Gilbert and Davis to show that each defendant used interstate communications.  As for evidence of the violations of the state ethics laws, the government will rely upon the evidence introduced regarding Count 1 and argue that the same evidence establishes that Defendants Gilbert and Davis acted in furtherance of a violation of state law.

**D.    False Statement Count**

To convict Connors on Count 9, the government will call United States Postal Inspector James Tynan.  Tynan will testify that, on November 29, 2016, he interviewed Connors.  During that interview, Connors denied knowing that Hammon had a financial interest in Trina Health or an affiliated entity.  Tynan will testify that, at that point in the investigation, Hammon was the investigation's primary target.  The extent to which Hammon concealed or shared with others his financial interest in Trina Health and its affiliated entities was material to the investigation of Hammon.

## V.  LIKELY EVIDENTIARY ISSUES

In addition to the issues already raised by the parties in the motions in limine and the parties' joint report on those motions, see Doc. 178, the government anticipates argument at trial over the admissibility of copies of email communications.  The following addresses the manner by which the government intends to introduce such email communication records.

First, it is helpful to note that, on December 11, 2018, the Court convened a telephone conference with the parties regarding the admissibility of co-conspirator statements.  During that conference, the Court instructed the government to, in this filing, identify the individuals whose statements the government intends to introduce as a statement of a co-conspirator made during and in furtherance of a conspiracy pursuant to Rule 801(d)(2)(E) of the Federal Rules of

Evidence and explain the manner by which the government intends to prove that the declarant was a co-conspirator of a defendant.  After that conference call, the government reviewed the evidence it intends to introduce at trial.  The government believes that the only individual whose statements the government may seek to introduce pursuant to Rule 801(d)(2)(E) is Hammon.  As for establishing the existence of a conspiracy between Hammon and Gilbert, the government will rely on Hammon's testimony primarily.  Gray's testimony, as well as Gilbert's email messages, will provide circumstantial evidence corroborating Hammon's testimony.

The majority of the email messages the government will seek to introduce will be consist of either: (1) Gilbert's messages to others; or (2) messages sent to Gilbert.  The former, the government will argue are admissible pursuant to Rule 801(d)(2)(A).  The latter, the government will argue are offered to show their effect on Gilbert.

There are some emails—primarily those from Trina Health, THCP, or CP Homes— which the government will seek to introduce as business records, pursuant to Rule 803(6).  Rule 803(6) provides that "[a] record of an act, event, condition, opinion, or diagnosis" is admissible as an exception to the rule against hearsay if: (1) "the record was made at or near the time by –or from information transmitted by—someone with knowledge"; (2) "the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit"; (3) "making the record was a regular practice of that activity"; (4) "all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification . . ."; and (5) "the opponent does not show that the source of information or method or circumstances of preparation indicate a lack of trustworthiness."  Fed. R. Evid. 801(6)(A)–(E).

The emails the government will seek to introduce will meet these requirements.  First, the emails will have been written by principals of either CP Homes, THCP, or Trina Health.  The statements in the emails will have to do with the companies' business operations.  For each company, those business operations will relate to Alabama diabetes treatment centers and efforts to ensure that BCBS-AL reimbursed for services rendered at such centers.  The records custodians for those companies will testify that the emails were preserved in the regular course of business operations.  Finally, the government is not aware of any effort by any defendant to demonstrate a lack of trustworthiness of such emails.  Accordingly, the Rule 803(6) requirements will be satisfied.  See id.

The government concedes that "the fact that emails are used for regularly conducted business activity does not render all emails admissible under the business-records exception." See Braggs v. Dunn, No. 2:14-CV-601-MHT-GMB, 2017 WL 426875, *3 (M.D. Ala. Jan. 31, 2017); see also Morisseau v. DLA Piper, 532 F. Supp. 2d 595, 621 n.163 (S.D.N.Y. 2008) ("An e-mail created within a business entity does not, for that reason alone, satisfy the business records exception of the hearsay rule.").  For example, emails discussing "purely personal matters, rather than business activities, not fall under the business-records exception and are therefore inadmissible."  Braggs, 2017 WL 4268755 at *3 n.2.  However, emails that are more formal in nature, containing "audit results, instructions to subordinates, incident reports, and requests for assistance," may be admissible, especially if accompanied by witness testimony indicating that the emails are the "only record of these business activities and communications." Id. at *3.

The emails the government will seek to introduce as business records will relate entirely to the business' joint efforts to ensure that the Alabama diabetes clinics were profitable.  The

emails will not consist of personal messages or other more casual correspondence.  Accordingly, they will meet the requirements of Rule 803(6).

Additionally, many of the email messages will consist of messages and responses grouped together in "chains."  Some of the messages in the chains will come from individuals associated with the business at issue.  Others will come from outside individuals.  The government will argue that the messages from outside individuals will be intended to show their effects on the business entities.  To the extent that this is not the case, the government will redact the hearsay portions of the chains.

Respectfully submitted, this 28th day of December, 2018.

LOUIS V. FRANKLIN, SR.
UNITED STATES ATTORNEY

/s/Jonathan S. Ross
Jonathan S. Ross
Assistant United States Attorney
131 Clayton Street
Montgomery, Alabama 36104
Phone: (334) 223-7280
Fax: (334) 223-7135
E-mail: jonathan.ross@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 2:18-CR-116-MHT-WC |
| | ) | |
| G. FORD GILBERT, | ) | |
| MARTIN J. CONNORS, and | ) | |
| RANDALL M. DAVIS | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on December 28, 2018, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to all

counsel of record.

Respectfully submitted,


/s/Jonathan S. Ross
Jonathan S. Ross
Assistant United States Attorney
131 Clayton Street
Montgomery, Alabama 36104
Phone: (334) 223-7280
Fax: (334) 223-7135
E-mail: jonathan.ross@usdoj.gov